**IN THE**
**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF ILLINOIS**
**PEORIA DIVISION**

CHARLES M.,
        Plaintiff,

v.                                                    Case No. 1:19-cv-01178-JES-JEH

COMMISSIONER OF SOCIAL
SECURITY,
        Defendant.

**Report and Recommendation**

Now before the Court is the Plaintiff's Motion for Summary Judgment (Doc. 11), the Defendant's Motion for Summary Affirmance (Doc. 15), and the Plaintiff's Reply (Doc. 16). This matter has been referred for a report and recommendation. The Motions are fully briefed, and for the reasons stated herein, the Court recommends the Plaintiff's Motion for Summary Judgment be denied and the Defendant's Motion for Summary Affirmance be granted.[1]

**I**

Charles M. filed an application for disability insurance benefits (DIB) on June 21, 2015, alleging disability beginning on June 28, 2014. His claim was denied on February 18, 2016 and upon reconsideration on May 11, 2016. Charles filed a request for hearing concerning his DIB application which was held before the Honorable Susan F. Zapf (ALJ) on January 17, 2018. At that hearing, Charles was represented by an attorney, and Charles, his wife, and a vocational expert (VE) testified. Following the hearing, Charles' claim was denied on May 7, 2018. His

---

[1] References to the pages within the Administrative Record will be identified by AR [page number]. The Administrative Record appears at (Docs. 7, 8) on the docket.

1

request for review by the Appeals Council was denied on April 4, 2019, making the ALJ's Decision the final decision of the Commissioner. Charles filed the instant civil action seeking review of the ALJ's Decision on May 31, 2019.

## II

At the hearing, Charles was 45 years old and lived with his wife and 10-year-old son in a house. He claimed the following conditions limited his ability to work: hyperthyroidism; other pulmonary disorders; hypertensive cardiovascular disease/hypertension; carpal tunnel syndrome; cervical spine impairment; lumbar spine impairment; severe back pain; herniated disc; unsuccessful back surgery; sleep apnea; Grave's Disease; shoulder pain; obesity; Vitamin D deficiency; protein deficiency; left elbow pain; left forearm pain; and cysts in throat. AR 325.

Charles testified that he had a 12th grade education and took one semester of college. He felt he could not work at all at present because his body "just won't move. It hurts. It goes into spasms and cramps." AR 50. He said he could no longer lift things like he used to, could not twist to do basic things like use the restroom, and some days, could not even bend over to put his socks on. He confirmed he had a history of two back surgeries – discectomies – and a doctor wanted to do a third one. Charles explained he was waiting to have that third surgery until "it really gets worse . . . to where the medicine is not controlling it now." AR 51. He answered that most days it was tolerable with his medications so that he did not want to go ahead with the third surgery at that time. He said he saw his "regular doctor," Terry E. Smith, M.D., for pain management, and Charles previously had back injections, water therapy, traction, saw chiropractors, and used a TENS unit. He used Fentanyl patches on each shoulder and used oxycodone as needed. He also used a decompression brace at home, and it worked

"really good" when he used it while reclined in a chair or when he laid down.  AR 55.

Charles testified his pain was in the "middle all the way."  AR 53.  He said the pain was in his hips, butt, and legs, and some days his pain was so bad he could not even get out of bed.  He could not get comfortable to sleep, even with sleep medicine, and got two to three hours of sleep at night.  A "good" night of sleep for him was four hours.  AR 66.  He only saw Dr. Smith, his primary care doctor, at that point.  He did not use a cane.  His wife assisted him with exercise by twisting him and bending his legs back.  He also used a belt next to his bed to stretch out his legs.  Charles explained he was prescribed Lyrica for nerve pain and that "seem[ed] to be helping quite a bit, but it also makes you tired."  AR 56.  The depression medications he tried before made him really tired and groggy.  Though a doctor told him to see a mental health specialist, Charles "blew it off and said I'm not seeing one of those."  *Id*.

He further testified that on an average day, he rated his pain at a constant three or four out of 10.  He said he felt sensation in mainly his right leg and it radiated down his left side to the bottom of his buttocks.  He said he had medicine at home "to where if I took more of it I am sure I would get more relief," but "I still have to function because I am a parent."  AR 57.  Charles testified that he drove his son to school less than half a mile from their home four days a week and drove a total of no more than 20 miles a week.  He said his doctors told him not to drive because of his medications.  Charles played video poker with his son, helped him with his homework, and attended his son's parent-teacher conferences.  He traveled to Tennessee with his family the previous summer and drove "a little bit" and spent most of the time in the passenger seat reclined.  He took "very short" rides on his ATV with his son.  He swam or floated around in his pool.  He went

out to dinner and a movie "once in a while." AR 72. He spent a half hour to two hours on the computer throughout the day.

Charles stated that he hurt his shoulder when working at Caterpillar, and after that he set up an appointment to get his herniated disc repaired. He was told he would recover after six to eight weeks, but four year later at the hearing, he was in worse shape. He said his family lost everything because of his back injury as he could no longer work. He testified further with regard to his right shoulder that he had surgery on it in January 2013, and it continued to pop and feel tight so that it would not go up "anymore." AR 78.

Charles answered that he thought he could sit without having to stand up for 20 or 30 minutes. As for how far he thought he could walk without having to sit down, it depended on the day. He said that, most of the time, it was more comfortable for him to sit than stand. As for his attempt to find sedentary or sit-down types of jobs, Charles testified that he did not really attempt to do so because of carpal tunnel in his hands. He said his forearm was smashed and so there was not a "whole lot of grip or much I can do with this hand." AR 62. He underwent surgery on that forearm in June 2009. He was right-handed. He said when he used his fingers a lot they became "real crampy." *Id*. He did not undergo carpal tunnel surgery. Doctors did not advise him to go ahead with that surgery. He answered that even if doctors offered him the surgery at that time, he would not do it because he was not looking for anymore surgeries "right now." AR 64. He was able to text on his phone and play video poker and other games "[f]or a while," and then his hands became "crampy." AR 68. Though he thought he could lift 20 pounds, he would "pay for it later." AR 63.

Upon questioning by his attorney, Charles explained that his medications for pain "maintain[ed] it enough to where you can function to get most of your stuff done during the day that you have to do." AR 76. As for his memory and

4

concentration, Charles testified, "It's not horrible.  It's not as good as it used to be though."  *Id.*  He elaborated that he would pay for it after he rode the ATV, and during the trip to Tennessee, his family made a lot of stops to get out of the car and move around.

The VE was next asked whether the following hypothetical individual of the same age, education, and past work experience as Charles could perform Charles' past work:

> [An individual] limited to a range of light work with standing and walking no more than two hours total in an eight-hour day, occasional foot controls with the right lower extremity, occasional ramps and stairs, no ladders, ropes or scaffolds, occasional balancing, kneeling, stooping and crouching, no concentrated exposure to temperature extremes and hazards, limited to frequent but not constant fingering with the dominant right hand and frequent but not constant reaching forward overhead with the right upper extremity, limited to unskilled work that can be easily resumed if the claimant has momentary deficits in concentration and attention, only occasional interaction with coworkers, the public and supervisors, no tandem tasks, no more than occasional changes in work processes and procedures.

AR 80-81.  The VE answered the individual could not perform Charles' past work, but there were sedentary jobs the individual could perform.  The VE also testified that the sedentary job numbers cited would not be significantly impacted by the individual's need to stand every 30 minutes for up to a minute or two.

Finally, Charles' wife, Renee Monroe, testified.  She said Charles had his "ups and downs mentally and physically."  AR 85.  She explained some days he slept more and some days he could get up.  She said two to three times a week she would put Charles' socks and shoes on him as he could not bend over.  She testified that if Charles rode the ATV he would then be down for two or three days afterward, that they stopped a lot on their trip to Tennessee to stretch, and that

5

Charles could not sleep at night.  She believed Charles was waiting to have the third surgery "until he cannot hack it anymore."  AR 91.

### III

In her Decision, the ALJ determined Charles had the following severe impairments:    degenerative disc disease; carpel tunnel; hypothyroidism; hypertension; affective disorder; and anxiety disorder.  AR 27.  The ALJ made the following residual functional capacity (RFC) finding:

> [T]he claimant had the [RFC] to perform sedentary work as defined in 20 CFR 404.1567(a) except he could stand and walk no more than two hours total in an eight-hour day.  He had to be able to stand at his workstation for up to two minutes every 30 minutes to stretch and adjust position.  He could work foot controls occasionally with the right lower extremity.  He could occasionally climb ramps or stairs, and could not climb ladders, ropes or scaffolds.    He could occasionally balance, stoop, kneel or crouch.  He could not work with concentrated exposure to temperature extremes and hazards.  He was limited to frequent but not constant fingering with the right, dominant hand and frequent but not constant reaching forward and overhead with the right upper extremity.  He was limited to unskilled work tasks that could be easily resumed if he had momentary deficits in concentration and attention.  He could not do tandem tasks and needed work with no more than occasional changes in work processes and procedures.    He could tolerate occasional interaction with coworkers, the public and supervisors.

AR 28-29.

The ALJ detailed that Charles alleged disability due to back, shoulder, and wrist pain and that the medical evidence of record established degenerative disc disease, carpal tunnel, hypothyroidism, and hypertension.  The ALJ cited lumbar studies, Charles' history of two discectomy surgeries, EMG test results, and physical examination results.  The ALJ also considered the results of Charles' physical and psychological consultative examinations done in December 2015.  She determined Charles had mild restriction in the ability to understand,

remember, or apply information; moderate restriction in the ability to interact with others; moderate restriction in the ability to concentrate, persist, or maintain pace; and moderate limitations in the ability to adapt or manage oneself.

She did not give significant weight to the State Agency physicians' opinions, the last of which was dated May 2016, because they "did not have the benefit of reviewing the latest medical evidence or assessing whether the claimant's statements at hearing [were] consistent with medical and other evidence of record." AR 33. She detailed Dr. Smith's December 2016 Medical Source Statement, his January 2017 letter, and his January 2018 Medical Source Statement pertaining to Charles' medical conditions. In December 2016 Dr. Smith opined Charles could not sit, stand, or walk for any period of time in an eight-hour day, could not lift or carry more than 20 pounds occasionally, he was incapable of even low stress work due to pain limiting his ability to focus, and he would miss more than three workdays per month. His January 2017 letter provided that Charles' treatments had not provided substantial relief but that he had "some partial control" of his pain with medications, that he had not been able to return to his previous level of function, and that, "While he may have a few days during which he could perform light duties for a few hours, he may have many more days during which he could not attend work at all." AR 33 (citing AR 1312). In his January 2018 Medical Source Statement, Dr. Smith opined Charles could walk one to one and one-half blocks without stopping to rest, sit about 30 minutes at one time, stand about 15 minutes, could sit about two hours and stand/walk less than two hours during an eight-hour day, and would need to take unscheduled breaks.

The ALJ summarized that due to back pain, fatigue, and drowsiness from medications, Charles could stand and walk no more than two hours total in an eight-hour day and he had to be able to stand at his workstation for up to two minutes every 30 minutes to stretch and adjust position. Due to a history of carpal

tunnel syndrome and allegations of hand, shoulder, and neck pain, Charles was limited to frequent but not constant fingering with the right, dominant hand and frequent but not constant reaching forward and overhead with the right upper extremity.

## IV

Charles argues:  the ALJ did not properly evaluate his RFC; the ALJ did not adequately assess opinion evidence; and the ALJ did not adequately address Charles' subjective allegations.

The Court's function on review is not to try the case de novo or to supplant the ALJ's findings with the Court's own assessment of the evidence.  *See Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000); *Pugh v. Bowen*, 870 F.2d 1271 (7th Cir. 1989). Indeed, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."   42 U.S.C. § 405(g). Although great deference is afforded to the determination made by the ALJ, the Court does not "merely rubber stamp the ALJ's decision." *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002).  The Court's function is to determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied.  *Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). Substantial evidence is defined as such relevant evidence as a reasonable mind might accept as adequate to support the decision.  *Richardson v. Perales*, 402 U.S. 389, 390 (1971), *Henderson v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999).

In order to qualify for disability insurance benefits, an individual must show that his inability to work is medical in nature and that he is totally disabled. Economic conditions, personal factors, financial considerations, and attitudes of the employer are irrelevant in determining whether a plaintiff is eligible for disability.  *See* 20 C.F.R. § 404.1566.  The establishment of disability under the Act is a two-step process.

First, the plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments, which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Second, there must be a factual determination that the impairment renders the plaintiff unable to engage in any substantial gainful employment. *McNeil v. Califano*, 614 F.2d 142, 143 (7th Cir. 1980). The factual determination is made by using a five-step test. *See* 20 C.F.R. § 404.1520. In the following order, the ALJ must evaluate whether the claimant:

1) currently performs or, during the relevant time period, did perform any substantial gainful activity;

2) suffers from an impairment that is severe and meets a durational requirement, or suffers from a combination of impairments that is severe and meets the durational requirement;

3) suffers from an impairment which meets or equals any impairment listed in the appendix and which meets the duration requirement;

4) is unable to perform her past relevant work which includes an assessment of the claimant's residual functional capacity; and

5) is unable to perform any other work existing in significant numbers in the national economy.

*Id*. An affirmative answer at steps 3 or 5 leads to a finding that the plaintiff is disabled. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005).

The plaintiff has the burdens of production and persuasion on steps 1 through 4. *Id*. However, once the plaintiff shows an inability to perform past work, the burden shifts to the Commissioner to show ability to engage in some

other type of substantial gainful employment. *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011).

In the instant case, Charles claims error on the ALJ's part at step Four.

## A

Charles first argues that the ALJ's RFC finding is lacking for several reasons: the ALJ did not explain why Charles' pain and difficulty with extended sitting was accommodated by an option to sit and stand at his workstation for up to two minutes every 30 minutes to adjust his position; the ALJ failed to properly address Charles' extreme obesity; the ALJ failed to discuss why Charles was capable of frequent fingering with his right hand beyond writing that such limitation was "due to the history of carpal tunnel syndrome;" the ALJ did not explain what evidence supported Charles could frequently reach forward and overhead with his right upper extremity; the ALJ did not analyze why Charles' limitations in concentration and attention were accommodated by the limitations set forth in the mental RFC; and the ALJ did not explain what evidence led to the conclusion that Charles could occasionally interact with the public, co-workers, and supervisors. The Commissioner counters that the objective record confirms the ALJ's conclusion that Charles could not perform physically demanding work, but he should be able to perform a range of sedentary work with a sit/stand option. The Commissioner further argues the ALJ properly considered all the evidence related to Charles' carpal tunnel syndrome and the extent to which it limited his function, Charles' argument as to concentration and attention ignores the ALJ's explanation in that regard, and the ALJ's RFC determination properly translated the State Agency doctors' opinions as to Charles' mental impairments.

Here, the ALJ noted Charles' statements that his arms felt heavy, his hands felt swollen, he had back pain after walking one block or standing ten minutes, he was bedridden about two days per week, and he paid for his activities. The ALJ

discussed that Charles had a history of two discectomy surgeries in 2012 and had been advised to try a fusion surgery, he treated with injections and chiropractic treatments for continued pain complaints, EMG testing indicated carpal tunnel in Charles' dominant right hand and also showed right L4 and L5 radiculopathy, and Charles' doctor noted in October 2016 weakness in some areas on his right side as well as that straight leg raising produced pain on his right side though strength was good on his left side. The ALJ included Charles' report in February 2017 that he was able to control his pain somewhat with his current treatment regimen and Charles' testimony in January 2018 that his pain averaged 3-4/10 with medication. The ALJ thus determined Charles' reported symptoms of pain, fatigue and limited motion were "consistent with the objective and other evidence to the extent he cannot perform more than sedentary work." AR 30.

Charles would have the Court nitpick the ALJ's Decision to find reversible error in her articulation of Charles' RFC. An RFC assessment "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8p; *see also Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001) ("In assessing the claimant's RFC, the ALJ must consider both the medical and nonmedical evidence in the record"). With regard to Charles' degenerative disc disease, the ALJ cited physical consultative physician Afiz Taiwo, M.D.'s notes that Charles could get on and off the exam table with no difficulty and could walk more than 50 feet without support, he had limited lumbar spine motion but full motion of the cervical spine, he had tenderness at L3 to L5 and positive straight leg raising. The ALJ also cited medical evidence in June 2017 of Charles' antalgic gait and tenderness of the back, and his negative straight leg raising on the left and nearly full hip motion. The ALJ acknowledged that Charles took strong pain medications, had a history of multiple treatment

11

modalities, and his medication made him tired.  But the ALJ also pointed out that Charles drove his child to school, testified that his medications reduced his pain level from 6-7 to 3-4/10, and he engaged in elective activities such that the ALJ could not conclude Charles was precluded from all work activities due to problems with pain.

The ALJ summarized that due to Charles' back pain, fatigue, and drowsiness from medications, he had to be able to stand at his workstation for up to two minutes every 30 minutes to stretch and adjust position, among other things.  The Court can easily trace the path of the ALJ's reasoning between the aforementioned evidence of record and her conclusion that Charles was to have a sit/stand option every 30 minutes for up to two minutes at a time as an accommodation for Charles' pain and difficulty sitting.  *See Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (stating that an ALJ must "sufficiently articulate his assessment of the evidence to assure us that the ALJ considered the important evidence . . . and to enable us to trace the path of the ALJ's reasoning").  As the ALJ did not have to discuss every piece of evidence, she did not have to explicitly explain why she did not provide for a sit/stand option of a different frequency and duration.  *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) ("an ALJ need not mention every piece of evidence, so long he builds a logical bridge from the evidence to his conclusion").  Moreover, Charles cites to little more evidence in the record as to his back impairment than did the ALJ in her Decision.  The additional evidence to which he does cite is much the same as that which the ALJ included in her Decision.

As for the ALJ's failure to explicitly mention Charles' obesity, such error was harmless.  *See McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011) (explaining that administrative error may be harmless and thus a court ought not remand a case to the ALJ where it is convinced that the ALJ would reach the same result).  His

argument that "[h]ad the ALJ properly assessed [his] combined obesity and lumbar pain, the ALJ *likely* would have found" Charles needed to more frequently stand to alleviate pain, for "lumbar pain *can* be worse when seated, and obesity *can* itself exacerbate musculoskeletal conditions" is nothing more than speculation. Plf's MSJ (Doc. 12 at pg. 9) (emphasis added); *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) (deciding remand for explicit consideration of the claimant's obesity would not affect the outcome of the case, and highlighting that the claimant did not specify how his obesity further impaired his ability to work, but "merely speculate[d]" that his weight made it more difficult to stand and walk). He cites to no evidence of record in support of his contention that the ALJ's failure to explicitly address his obesity renders the sit/stand option the ALJ provided unsupported by substantial evidence.

With regard to Charles' carpal tunnel syndrome and right upper extremity, the ALJ pointed out that despite EMG evidence of carpal tunnel syndrome, Charles had not undergone surgery. The ALJ observed, "This suggests that his pain level may be tolerable at this point and he has elected not to undergo intervention." AR 30. The ALJ also pointed out that Dr. Taiwo's December 2015 physical consultative examination revealed 4/5 grip strength in Charles' right hand and full grip strength in his left hand. The ALJ summarized that due to Charles' history of carpal tunnel syndrome "with allegations of hand, shoulder and neck pain, he was limited to frequent but not constant fingering with the right, dominant hand and frequent but not constant reaching forward and overhead with the right upper extremity." *Id.* Again, the Court can trace the path of the ALJ's reasoning between the record evidence and her conclusion that Charles' right hand and right upper extremity limitations were accommodated by a limitation to frequent fingering and reaching forward and overhead.

Charles argues that the ALJ failed to explain why significant evidence of hand problems, the bulk of which no doctor reviewed, supported that he could finger with his right hand for over five hours of the workday. Of course, the fact that a doctor did not review some evidence of record does not render the ALJ's RFC unsupported because the RFC determination is an issue reserved to the Commissioner. *See* 20 C.F.R. § 404.1527(d)(2) ("Although we consider opinions from medical sources on issues such as . . . your residual functional capacity . . . the final responsibility for deciding these issues is reserved to the Commissioner"). Charles emphasizes the medical evidence the ALJ allegedly failed to consider with regard to his hand problems and right upper extremity, but again, in assessing a claimant's RFC, an ALJ must consider *both* the medical and non-medical evidence to determine the most an individual can do despite his limitations. SSR 96-8p; *Dixon*, 270 F.3d at 1178. The ALJ in this case obviously did that where she considered the medical evidence of carpal tunnel, Charles' statements as to the use of his hands and arms, and Charles' reported activities of daily living.

With regard to Charles' moderate restrictions in concentration and attention and the ability to interact with others, the ALJ detailed Charles' reports of poor focus and concentration, irritability, mood swings, and social isolation. The ALJ also detailed that Charles did not require a hospital or emergency room visit for mental symptoms, did not treat with a mental health professional, received medications through primary care physicians, and reported good relief of symptoms with medications. The ALJ emphasized Dr. Smith's comment in May 2017 that he thought Charles' mood decent "considering the chronic pain and limitations imposed on his life from the pain," and Charles' own August 2017 comment that he was irritable at times but that did not affect his relationships because he was able to control his irritability. David NieKamp, Psy.D.'s December 2015 psychological consultative examination showed no indication of

14

psychomotor agitation or retardation.  Beyond the limitations to unskilled work tasks that could be easily resumed if Charles had momentary deficits in concentration and attention, no tandem tasks, and no more than occasional changes in work processes and procedures, the ALJ explained further limitations were not established by the record, specifically citing Charles' reported ability to pay bills, handle finances, make change, and his observed intact memory and concentration.

Charles argues error because:  1) no doctor opined to only momentary concentration lapses nor that he could resume work tasks after momentary concentration lapses; and 2) the ALJ failed to logically bridge the accommodations in the RFC assessment to Charles' specific concentration difficulties.  Charles loses sight of the fact that the ALJ's Decision need only be supported by "more than a mere scintilla" of evidence.  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) ("Substantial evidence, this Court has said, is more than a mere scintilla") (internal citations omitted).  The ALJ certainly did not exhaustively discuss the evidence of Charles' mental impairments, but she was not required to do so.  In addition to the above evidence the ALJ discussed, she observed that his work history evidenced no difficulties working with or sustaining basic tasks, the record failed to establish evidence of any significant deterioration in cognitive functioning since he stopped working, and Dr. NieKamp concluded Charles' cognitive functions appeared to be operating within expected developmental limits.   Contrary to Charles' assertion, it is clear that the ALJ provided accommodations proportionate to the extent of Charles' concentration difficulties reflected in the record.  Charles' presentation of specific record evidence in his briefs essentially, and improperly, invites the Court to reweigh the evidence.  *See Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (explaining that in reviewing an ALJ's decision, the court cannot

reweigh evidence, resolve conflicts in the record, decide questions of credibility, or otherwise substitute its own judgment for that of the Commissioner).

Charles' argument that the ALJ did not apprise the VE of his specific concentration limitations is similarly unconvincing. "As a general rule, both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record." *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014). The hypothetical must therefore "explicitly account for" deficiencies in concentration, persistence, or pace. *DeCamp v. Berryhill*, 916 F.3d 671, 675 (7th Cir. 2019). Here, Charles merely relies upon the fact that in some cases, the Seventh Circuit Court of Appeals has determined that a claimant's moderate limitation in concentration, persistence, or pace is not sufficiently conveyed by a limitation to unskilled work. What the extensive body of case law on this issue makes abundantly clear is that it requires a nuanced application of such boilerplate statements of the law to the particular facts of the case. As the Court has already determined that the ALJ provided accommodations in the mental RFC proportionate to the extent of Charles' concentration difficulties reflected in the record, the Court finds the ALJ adequately apprised the VE of Charles' moderate restriction in the ability to concentrate.

As for Charles' argument that the ALJ did not explain what evidence led to the conclusion that he could occasionally interact with the public, co-workers and supervisors, he seemingly chooses to ignore what the ALJ explicitly stated in her Decision. She cited Charles' own report in August 2017 that he was able to control his irritability so that it did not affect his relationships; his doctor thought his mood "decent;" his report to Dr. Smith in October 2015 that Paxil helped considerably with his anger issues; his record did not include evidence of evictions, altercations, or severe social isolation; claims representatives described him as cooperative and appropriate; and his reports that he interacted regularly with family, although he

said he tended to limit his social contacts with them.  Reading the ALJ's Decision as a whole and with commonsense, she most certainly determined Charles could occasionally interact with the public, co-workers, and supervisors in light of such evidence.  *See Rice v. Barnhart*, 384 F.3d 363, 369 n.5 (7th Cir. 2004) ("[I]t is proper to read the ALJ's decision as a whole . . . ."); *Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1999) ("we give the opinion a commonsensical reading rather than nitpicking at it").

## B

Charles next argues that the ALJ failed to explain what substantial evidence in the Decision was inconsistent with treating Dr. Smith's work-preclusive opinions beyond noting that the diagnostic and clinical findings were not as severe as Dr. Smith indicated.  He insists the ALJ did not explain why the "wealth of abnormal objective evidence" was insufficient to support Dr. Smith's opinion beyond substituting her judgment for that of a longtime treating medical professional.  Plf's MSJ (Doc. 12 at pg. 16).  The Commissioner argues the ALJ offered reasons for the weight she gave Dr. Smith's opinions and provided good reasons for doing so.  He further argues that the objective evidence upon which the ALJ relied and other factors the ALJ considered were substantial evidence in support of the ALJ's determination that Charles could perform sedentary level work which accommodated his physical limitations.

20 C.F.R. § 404.1527(c) provides:

> How we weigh medical opinions.  Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (c)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.

The listed factors include:  1) examining relationship; 2) treatment relationship, which in turn includes length of the treatment relationship and the frequency of

17

examination, and the nature and extent of the treatment relationship; 3) supportability; 4) consistency; 5) specialization; and 6) other factors brought to the Social Security Administration's attention. *Id*. An ALJ must give controlling weight to the medical opinion of a treating physician only if the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence." 20 C.F.R. § 404.1527(c)(2).[2]

Here, the ALJ recited Dr. Smith's December 2016, January 2017, and January 2018 opinions as to Charles' ability to function given his medical issues. The ALJ stated she considered all of those statements and gave them weight to the extent they were consistent with the adopted RFC. However, "To the extent Dr. Smith stated the claimant could not sustain a limited range of sedentary work, his opinions are out of proportion to the objective evidence and were given no weight." AR 33. The ALJ explicitly recognized Dr. Smith was a "treating source with a long-term treatment history." Nevertheless, the ALJ explained "the diagnostic and clinical findings of record are not as severe as Dr. Smith indicates. The record supports a finding that the claimant retains the ability to perform work-related activities within the highly restrictive [RFC]." AR 34.

While true the ALJ did not cite to the additional evidence Charles cites as part of the "wealth of abnormal objective evidence" which he says supports Dr. Smith's opinions, the ALJ did minimally articulate her reasons for rejecting evidence of disability in the form of Dr. Smith's opinions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000) ("While the ALJ is not required to address every piece of evidence, he must articulate some legitimate reason for his decision"); *Skarbek*, 390 F.3d at 503 (reiterating that an ALJ may discount a treating physician's medical

---

[2] The treating physician rule found in 20 C.F.R. § 404.1527 has since been eliminated by the Social Security administration. However, the rules in § 404.1527 apply to claims filed before March 27, 2017.

opinion as long as he "minimally articulates his reasons for crediting or rejecting evidence of disability"). To the extent the ALJ articulated Dr. Smith's opinions were out of proportion to the objective evidence and the record, the ALJ clearly considered the supportability and consistency of Dr. Smith's opinions. That conclusion is supported by substantial evidence given the ALJ's consideration of Charles' daily activities, his reported symptoms, the efficacy of his medications, and physical consultative examination results. Moreover, the fact of additional records documenting "abnormal" results of course does not alone compel an ALJ to find a claimant disabled; it still remains the ALJ's task to determine the extent of limitation imposed by a claimant's medical impairments as evidenced, in part, by such "abnormal" results. *See* 20 C.F.R. § 404.1527(d)(2) (providing that the final responsibility for deciding a claimant's RFC is reserved to the Commissioner). Ultimately, the ALJ accounted for those abnormal test results where he gave Dr. Smith's opinions weight to the extent they were consistent with the "highly restrictive" RFC.

## C

Lastly, Charles argues that the ALJ did not adequately address his subjective allegations where the ALJ did not explain the inconsistencies between his daily activities and his complaints of pain and the medical evidence, the ALJ did not discuss his significant medication usage and explain why his willingness to take such medication did not suggest that his complaints of pain and concentration difficulties were severe and ongoing, and the ALJ did not mention Charles' wife's testimony. The Commissioner disputes that the ALJ failed to explain herself in determining that Charles' subjective allegations were inconsistent with the record as a whole.

SSR 16-3p directs the ALJ to focus on the "intensity and persistence of the applicant's symptoms." *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016). SSR 16-3p

provides that all the evidence, including objective medical evidence, is to be considered in evaluating the intensity, persistence, and limiting effects of an individual's symptoms and also the factors set forth in 20 C.F.R. § 404.1529(c)(3) are to be considered including: the claimant's daily activities; the location, duration, frequency, and intensity of pain or other symptoms; precipitating and aggravating factors; medications and their side effects; non-medication treatments; any other measures used to relieve pain or other symptoms; and any other factors concerning the claimant's functional imitations and restrictions due to pain and other symptoms. SSR 16-3p, at *7-8.

Here, the ALJ highlighted certain objective medical evidence pertaining to Charles' back, wrist, neck, and hands. She pointed out that Charles testified his pain averaged 3-4/10 with medication and that he reported in February 2017 that he was able to control his pain somewhat with his current treatment regimen. She also pointed out that there were no hospital or emergency room visits for back or hand pain after the alleged onset date. She acknowledged Charles' "multiple treatment modalities," he did not require an assistive device, he took strong medications which he said made him tired yet he drove his son to school, his pain medications reduced his pain level, and his daily activities included riding a four-wheeler with his son, driving a riding mower, folding clothes, vacuuming, cooking, taking out the trash, and helped his son with his homework. The ALJ thus considered the factors in § 404.1529 in order to determine the persistence and limiting effects of Charles' symptoms.

Though Charles assigns error to the ALJ's consideration of Charles' medication usage, the ALJ more than once pointed out that Charles experienced *reduced* pain due to his medications. The ALJ was not required to ignore that fact and focus instead only upon the fact that Charles took a significant amount of medications as support for his subjective allegations of pain and other limiting

symptoms.  Though Charles assigns error to the ALJ's consideration of Charles' daily activities, the ALJ's explanation as to how those activities factored into her Decision reveals she did not equate those activities with the ability to work. Rather, the ALJ made clear that Charles' "choice of elective activities" undermined the extent to which he alleged his pain interfered with his ability to work as she stated "the undersigned cannot conclude that he is entirely precluded from all work activities due to problems with pain."  AR 31.  Though Charles assigns error to the ALJ's failure to explicitly consider his wife's testimony, the portions of her testimony he highlights are essentially redundant of Charles' own statements and testimony.  Therefore, because the ALJ sufficiently considered Charles' statements and testimony, the ALJ did not err in failing to explicitly discuss his wife's testimony.  *See Carlson*, 999 F.2d at 181 (explaining that the ALJ's failure to explicitly address the claimant's wife's testimony did not amount to a fatal failure to consider an entire line of evidence where the ALJ explicitly addressed the claimant's testimony and the wife's testimony was "essentially redundant").

## V

For the reasons set forth above, it is recommended that:  1) the Plaintiff's Motion for Summary Judgment (Doc. 11) be denied; 2) the Defendant's Motion for Summary Affirmance (Doc. 15) be granted; 3) The Clerk of Court be directed to enter judgment as follows: "IT IS ORDERED AND ADJUDGED that the decision of the Defendant, Andrew Saul, Commissioner of Social Security, denying benefits to the Plaintiff, Charles M., is AFFIRMED."; and 4) this matter be terminated.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk within fourteen (14) days after service of this Report and Recommendation.  FED. R. CIV. P. 72(b)(2); 28 U.S.C. § 636(b)(1).  Failure to object will constitute a waiver of objections on appeal.

*Johnson v. Zema Systems Corp.*, 170 F.3d 734, 739 (7th Cir. 1999); *Lorentzen v. Anderson Pest Control*, 64 F.3d 327, 330 (7th Cir. 1995).

*It is so recommended.*

Entered on May 14, 2020.

<u>s/Jonathan E. Hawley</u>
U.S. MAGISTRATE JUDGE